## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MORGAN L. TOMPKINS,** | ) | |
| **Plaintiff** | ) | Civil Action No. 2:19cv00018 |
| | ) | |
| **v.** | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **ANDREW SAUL,[1]** | ) | |
| **Commissioner of Social Security,** | ) | By:   Pamela Meade Sargent |
| **Defendant** | ) | United States Magistrate Judge |
| | ) | |

*I. Background and Standard of Review*

Plaintiff, Morgan L. Tompkins, ("Tompkins"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

1

a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Tompkins protectively filed his application for DIB on November 12, 2014, alleging disability as of December 31, 2011, due to residuals from a broken neck; upper back pain; anxiety and panic attacks. (R. at 12, 224.) The claims were denied initially and upon reconsideration. (R. at 112-14, 120, 122-24, 126-28.) Tompkins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 129-30.) The ALJ held a hearing on November 20, 2017, at which Tompkins was represented by counsel. (R. at 26-65.)

By decision dated March 16, 2018, the ALJ denied Tompkins's claim. (R. at 12-21.) The ALJ found Tompkins met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2017. (R. at 14.) The ALJ found Tompkins had engaged in substantial gainful activity from December 31, 2011, through January 1, 2013.  (R. at 14.)  However, the ALJ found there had been a continuous 12-month period during which Tompkins did not engage in substantial gainful activity.[2] (R. at 15.) The ALJ found the medical evidence established Tompkins had severe impairments, namely status-post cervical fracture; anxiety disorder; depressive disorder; and polysubstance abuse, but he found Tompkins did

---

[2] Thus, in order to be eligible for DIB benefits, Tompkins must show he was disabled between January 2, 2013, the date after which he was not engaging in substantial gainful activity, and March 31, 2017, the date last insured.

not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ found Tompkins had the residual functional capacity to perform a limited range of light work[3] that did not require more than frequent kneeling, balancing and climbing ramps/stairs; that did not require more than occasional crawling, crouching, stooping or climbing ladders/ropes/scaffolds; that did not require the performance of more than simple instructions and maintaining persistence to perform simple tasks throughout a standard workday; that did not require more than few day-to-day changes; and that did not require working in an environment requiring heavy interpersonal demands, such as sales or resolving customer complaints. (R. at 16-17.) The ALJ found Tompkins could not perform any past relevant work. (R. at 20.) Based on Tompkins's age, education, work history and residual functional capacity, and the testimony of a vocational expert, the ALJ found there were other jobs existing in significant numbers in the national economy that Tompkins could perform, including those of a hand packer, a laundry worker and a production assembler. (R. at 20-21.) Thus, the ALJ concluded Tompkins was not under a disability as defined by the Act through the date last insured and was not eligible for DIB benefits. (R. at 21.) *See* 20 C.F.R. § 404.1520(g) (2019).

After the ALJ issued his decision, Tompkins pursued his administrative appeals, (R. at 187-89), but the Appeals Council denied his request for review. (R. at 1-5.) Tompkins then filed this action seeking review of the ALJ's unfavorable

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with occasional lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §404.981 (2019). This case is before this court on Tompkins's motion for summary judgment filed September 9, 2019, and on the Commissioner's motion for summary judgment filed November 9, 2019.

## II. Facts[4]

Tompkins was born in 1980, (R. at 191), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Tompkins has a tenth-grade education with training in welding and past work experience as a truck driver and a tractor trailer driver. (R. at 31-32, 44, 225.) Tompkins testified he drove a tanker truck for a gas company, he drove a coal truck, and he drove a semi-truck hauling wood chips. (R. at 31-32.) He stopped working for about six months following a December 2011 motor vehicle accident in which he broke his neck. (R. at 33-36.) He returned to work, on a mostly part-time basis, during the latter part of 2012 into the early part of 2013. (R. at 36-37.) Upon returning, he stated he had very bad pain and stiffness and decreased range of motion in his neck, which made it difficult to check his mirrors. (R. at 37.) Tompkins said it "wore [him] out" trying to turn his head. (R. at 37.) Eventually, he stopped working even part-time because "it was extremely different and [more] difficult than before. My whole body – everything was changed." (R. at 38.) Tompkins stated he wore a neck brace for about four months following the accident, and he had received no follow-up treatment since about six months after the accident, at which time he was released from a neurosurgeon's care.

---

[4] On appeal, Tompkins's arguments center around the ALJ's findings related to his mental residual functional capacity. Therefore, the court will limit its discussion to those facts relevant to Tompkins's mental impairments and accompanying limitations.

(R. at 39.)  Tompkins stated he also treated with Dr. Kanwal, a primary care provider, for about a year after the motor vehicle accident.  (R. at 39.)

Tompkins also testified he had experienced problems with depression and anxiety that he did not have prior to the accident.  (R. at 43.)  He stated he experienced three to four "pretty bad" panic attacks weekly, during which his blood pressure would rise, his face would become hot, and his heart rate would increase.  (R. at 45.)  These attacks typically would last for half an hour, and he would feel "pretty depressed" and "no good" afterwards.  (R. at 45-46.)  Tompkins testified his depression made him feel worthless.  (R. at 46.)  He stated he always had experienced problems maintaining focus, attention and concentration, noting that this was an issue in school.  (R. at 46.)  Tompkins testified that, although he could drive, he did not go many places, and he avoided going out in public when possible.  (R. at 46, 49.)  He testified he did not go in stores because he did not like crowds, noting it usually would trigger a panic attack.  (R. at 50.)  However, he stated he had never gone to the emergency department for a panic attack.  (R. at 50.)

Tompkins stated he did not graduate from high school, and he did not have a General Education Development, ("GED"), diploma.  (R. at 44.)  Tompkins also stated he had difficulty in high school, including decreased attention and difficulty retaining and remembering what he read.  (R. at 44.)  He stated he failed most of his classes, but he learned welding, and even worked as a welder before he started driving a truck.  (R. at 44-45.)  Tompkins testified he no longer had a commercial driver's license, ("CDL"), and he doubted he could pass the requisite physical examination for reinstatement.  (R. at 50.)  He stated he lived beside his parents in a trailer with his disabled fiancée, who performed the cooking and cleaning.  (R. at 51-52.)  Tompkins stated he was able to manage his personal care, including

medication management.  (R. at 52, 56.)  He testified he had two children, a 14-year-old son, who stayed with him every other week, and a 17-year-old daughter, who stayed with him and his parents most of the time.  (R. at 52-54.)  He stated he played video games with his son, but he did not help with schoolwork.  (R. at 53.)  Tompkins testified his parents had two dogs, and his daughter had a cat, but he did not care for them.  (R. at 54.)  He then stated he would feed the dogs when they needed it, and the dogs would accompany him on walks.  (R. at 54-55.)  Tompkins testified he watched television from time to time, including fishing shows, Ultimate Fighting Championship shows and the news.  (R. at 55-56.)

Tompkins also testified to previous issues with drug abuse.  (R. at 47.)  He stated he had begun Suboxone treatment about four or five weeks prior to the hearing, and he had undergone prior treatment, including a program from which he was discharged in December 2015 for noncompliance with drug use policies.  (R. at 48.)  Tompkins stated he had experienced kidney stones, which led to "a problem."  (R. at 48.) He said he had abused prescription medications in his early 20s, prior to the accident, and, following the accident, he abused opiates and benzodiazepines, which were prescribed for him.  (R. at 48.)  However, he stated he was doing "pretty good" since being in Suboxone treatment.  (R. at 48-49.)

Barry Steven Hensley, a vocational expert, also testified at Tompkins's hearing. (R. at 58-63.) Hensley classified Tompkins's work as a heavy truck driver and as a tractor trailer driver as medium[5] and semi-skilled.  (R. at 59.)  He testified a hypothetical individual of Tompkins's age, education and work history, who could

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If someone can perform medium work, he also can perform light and sedentary work.  *See* 20 C.F.R. § 404.1567(c) (2019).

perform medium work that did not require more than frequent crawling, crouching, kneeling, stooping, balancing and climbing; who could understand, remember and carry out simple instructions and maintain persistence to perform simple tasks throughout a standard workday; who should work in an environment with few day-to-day changes; and who should not work in situations requiring heavy interpersonal demands, such as sales or resolving customer complaints, could perform Tompkins's past work. (R. at 59.) Hensley also testified this individual could perform other jobs existing in significant numbers in the national economy, including those of a custodian/cleaner, a hand packer and a production helper. (R. at 59-60.) Hensley next testified that a hypothetical individual who was limited to the performance of light work with no more than frequent kneeling, balancing and climbing of ramps/stairs; no more than occasional crawling, crouching, stooping and climbing ladders/ropes/scaffolds; who could understand, remember and carry out simple instructions and maintain persistence to perform simple tasks throughout a standard workday; who should work in an environment with few day-to-day changes and should not work in situations requiring heavy interpersonal demands, could not perform Tompkins's past work, but could perform work as a hand packer, a laundry worker and a production assembler. (R. at 60-61.) Hensley next was asked to consider the same hypothetical individual, but who should not work with the public or have any interaction with co-workers or supervisors. (R. at 61.) He testified that such an individual could not perform any competitive work. (R. at 61.) Hensley also testified that an individual who would be off-task 15 percent or greater during a workday on a routine and regular basis, could not perform competitive work. (R. at 63.) Lastly, Hensley testified that an individual who would be tardy or who would be absent two days or more monthly, could not perform competitive work. (R. at 63.)

In rendering his decision, the ALJ reviewed records from Wellmont Holston Valley Medical Center, ("Holston Valley"); Dr. Gregory Corradino, M.D.; Coeburn Hospital Clinic; Dr. Gurchuran Kanwal, M.D.; Dickenson Community Hospital; Southern Medical Group; Elizabeth A. Jennings, M.A.; Wise County Public Schools; Norton Community Hospital; Mountain View Regional Medical Center, ("Mountain View"); Watauga Recovery; Louis Perrott, Ph.D., a state agency psychologist; Dr. Gene Godwin, M.D., a state agency physician; Stephen P. Saxby, Ph.D., a state agency psychologist; and Dr. Josephine Cader, M.D., a state agency physician.

Following a motor vehicle accident on December 13, 2011, Tompkins was transferred from Mountain View to Holston Valley for further treatment and a neurosurgical consult with Dr. Gregory Corradino, M.D.  (R. at 265-341, 490-91.) Diagnostic studies showed fractures at the C2 and C3 levels of the cervical spine without spinal cord or ligamentous injury.  (R. at 294, 298.)  Dr. Corradino treated Tompkins conservatively with a cervical collar.  (R. at 268.)  Upon discharge on December 17, 2011, Tompkins was neurovascularly intact and in good condition. (R. at 266.)  He was given strict instructions to wear the collar at all times, he was prescribed Lortab for pain, and he was scheduled for a follow-up appointment in two weeks.  (R. at 266.)

Tompkins was treated in the emergency department at Norton Community Hospital on January 29, 2012, for complaints of left flank pain and associated nausea.  (R. at 485.)  Aside from gastrointestinal/genitourinary tenderness, examination, including psychiatric findings, was normal.  (R. at 486.)  A CT scan revealed a stone in the left ureter and multiple calcifications in the left kidney, as well as likely colitis.  (R. at 488.)  Tompkins was diagnosed with left ureteral calculi,

likely due to chronic colitis, and a urinary tract infection, for which he was prescribed Lortab, Phenergan, Cipro and Flomax. (R. at 486-87.)

Tompkins saw Dr. Corradino in follow up on three occasions between March 6 and June 21, 2012. (R. at 375-80.) Over this time, Tompkins continued to improve. In March 2012, he was advised to wean out of the cervical collar. (R. at 378-80.) In May 2012, he reported increasing his activity, including fishing. (R. at 378.) In June 2012, Tompkins stated he had been working out at home and lifting up to 50 pounds without difficulty. (R. at 376.) He stated he was ready to return to work. (R. at 376.) On June 21, 2012, Dr. Corradino released Tompkins to return to medium-duty work, which he defined as lifting no greater than 50 pounds, for four weeks. (R. at 376.) Thereafter, he could resume work without restrictions after July 27, 2012. (R. at 376.) Other than being described as cooperative on June 21, 2012, examinations over this period did not include any psychiatric findings. (R. at 375.)

Tompkins began seeing Dr. Gurchuran Kanwal, M.D., on March 18, 2014, for complaints including occasional anxiety and panic attacks since the 2011 motor vehicle accident.[6] (R. at 395-96.) He also reported he was going through a divorce. (R. at 397.) Tompkins denied depression at that time. (R. at 396.) On examination, Dr. Kanwal checked boxes indicating insomnia, anxiety and nervousness. (R. at 397.) He explained that Tompkins was stressed out and noted he could not "handle people." (R. at 397.) Dr. Kanwal diagnosed, among other things, anxiety and occasional panic, and he prescribed Valium and Prozac. (R. at 398.) A urine drug screen was negative for illicit drugs, and no nonprescribed medications were detected. (R. at 442, 451-53.) When Tompkins returned to Dr. Kanwal on April 16,

---

[6] Dr. Kanwal's treatment notes are handwritten and largely illegible. The court has given its best effort in deciphering these notes.

2014, he was diagnosed with anxiety, depression and occasional panic, and Dr. Kanwal prescribed Prozac. (R. at 394.) On May 14, 2014, Dr. Kanwal stated Tompkins's bigger problem was his nerves, which had been a problem since the 2011 motor vehicle accident. (R. at 393.) However, Tompkins's psychiatric condition was deemed stable. (R. at 393.) Dr. Kanwal diagnosed anxiety and panic, and he prescribed Xanax.[7] (R. at 393.) On June 12, 2014, Tompkins continued to complain of panic, which Dr. Kanwal noted on examination. (R. at 392.) He continued to diagnose anxiety and panic, for which he continued medications. (R. at 392.) On July 10, 2014, Tompkins voiced continued complaints of panic, noting he stayed nervous, shaky, fidgety and restless. (R. at 391.) On examination, Dr. Kanwal noted Tompkins was in a chronic state of anxiety, he diagnosed anxiety and panic, and he prescribed Klonopin. (R. at 391.)

On July 29, 2014, Tompkins was transported to the emergency department at Mountain View for a drug overdose. (R. at 498-516.) He admitted to smoking synthetic marijuana, but a drug screen was positive for amphetamines and benzodiazepines. (R. at 499, 505.) It was noted that Tompkins currently was prescribed Xanax, Ultram and Neurontin. (R. at 502.) On physical examination, he was lethargic, slowed and had slurred speech. (R. at 503.) After Tompkins was placed in the ICU, he began requesting pain medications. (R. at 499.) When advised he would not be receiving any medications while hospitalized for a drug overdose, he left against medical advice. (R. at 499.)

Tompkins continued to treat with Dr. Kanwal through February 2015. In August, October and November 2014, he continued to complain of panic, he was

---

[7] It appears that Dr. Kanwal might also have diagnosed questionable depression, but the handwriting is very difficult to decipher.

diagnosed with anxiety and panic, and he was continued on medications. (R. at 388-90.) A November 4, 2014, urine drug screen was positive for benzodiazepines and opiates. (R. at 441, 447-50.) On December 2, 2014, Tompkins reported he was going through a divorce and was very agitated. (R. at 387.) Dr. Kanwal diagnosed anxiety and depression and continued medications. (R. at 387.) On December 29, 2014, Dr. Kanwal continued to diagnose anxiety and panic, but he indicated Tompkins's psychiatric condition was stable. (R. at 427.) On January 28, 2015, Tompkins again complained of panic. (R. at 426.) He admitted taking Suboxone. (R. at 426.) Again, Dr. Kanwal diagnosed anxiety and panic, and he continued Tompkins on medications. (R. at 426.) A urine drug screen was positive for marijuana, synthetic opioids and benzodiazepines. (R. at 440, 443-46.) On February 25, 2015, Tompkins disputed an abnormal urine drug screen. (R. at 425.) Dr. Kanwal diagnosed anxiety and panic, and he advised Tompkins to wean off the Suboxone or find another doctor. (R. at 425.)

On March 13, 2015, in connection with the initial determination of Tompkins's disability claim, Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Tompkins was mildly restricted in his activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no extended-duration episodes of decompensation. (R. at 74-75.)

On July 25, 2015, Tompkins saw Dr. Veronica Robinson, D.O., for a consultative examination of both his physical and mental condition. (R. at 456-59.) Among other things, Tompkins complained of anxiety subsequent to the December 2011 motor vehicle accident. (R. at 456.) He also stated he was taking Klonopin

for his anxiety and Suboxone for pain.  (R. at 456.)  Tompkins reported moderate to, at times, severe anxiety that developed shortly after the accident.  (R. at 456.)  He stated he feared walking into public places or going any place that was "heavily populated."  (R. at 456.)  He reported that, due to excessive worry, he was unable to concentrate, making him unable to pay his bills, with which his parents had assisted for about a year.  (R. at 456.)  He also noted that, due to an anxiety disorder, he had been dependent on his parents for about a year to purchase items from the store.  (R. at 456.)  Tompkins denied ever having seen a psychiatrist, but he reported a history of anxiety treatment with Xanax and Valium with minimal relief.  (R. at 456.)  Tompkins denied alcohol and illegal drug use.  (R. at 456.)  He denied mood change and suicidal ideation, but he endorsed depression, nervousness, anxiety, difficulty concentrating and difficulty sleeping.  (R. at 457.)  On examination, Tompkins was appropriately dressed and in no acute distress.  (R. at 457.)  He was alert, fully oriented and cooperative; he did not appear depressed, but was somewhat anxious appearing; he was able to communicate without deficits; and recent and remote memory were intact.  (R. at 458.)  Dr. Robinson diagnosed anxiety, among other things, and she recommended a referral to psychiatry with consideration for medical therapy replacement with a nonbenzodiazepine, given Tompkins's history of opioid addiction.  (R. at 458.)  She noted that, although he was able to hold a conversation and respond appropriately to questions, Tompkins appeared to have poor concentration.  (R. at 458.)

Elizabeth A. Jennings, M.A., a licensed psychologist, completed a consultative psychological evaluation of Tompkins on January 7, 2016.  (R. at 463-67.)  Tompkins had good grooming, he was dressed appropriately, he was cooperative, and he had normal psychomotor behavior.  (R. at 463.)  He reported varied sleep; energy that was "not well"; depressed mood for the past few weeks,

but no crying spells; weight loss without trying, but he stated his appetite was improving; quite a few panic attacks that occurred both situationally and randomly; staying nervous a lot; and frequent nightmares. (R. at 464.) He stated, "I hate being in a vehicle. It's hard for me to drive or hard for me to talk when I'm that anxious." (R. at 464.) Tompkins stated his panic attacks had worsened over the prior two months, and he stated he was shaking and sweating in the waiting room. (R. at 464.) He had no overt obsessive compulsive symptoms, and he reported no symptoms of post-traumatic stress disorder, ("PTSD"), or psychosis. (R. at 464.) Tompkins reported he stayed in his house "too much." (R. at 464.) He said he got up at 7:00 a.m. and helped his children get ready for school and on the school bus. (R. at 464, 465.) He stated, "I do what I can around the house," but he said he had to "stop and start." (R. at 464.) Tompkins also stated he helped his children with homework and tried to "be there for them." (R. at 464.) He reported he had a good relationship with his children, of whom he had custody every other week. (R. at 465.) He reported he was not receiving mental health counseling, and he had received no inpatient psychiatric treatment, but he had visited the emergency department for panic attacks.[8] (R. at 464-65.) Tompkins also stated he was prescribed Klonopin for severe anxiety by his primary care provider. (R. at 465.) He denied any current or previous drug or alcohol abuse. (R. at 465.)

Tompkins reported he had a tenth-grade education and had not received his GED. (R. at 465.) He was retained twice in school, but he could not remember which grades. (R. at 465.) Tompkins reported that his grades were average, and he attended regular classes, as well as some vocational classes for welding. (R. at 465.)

---

[8] There are no treatment notes in the record showing such emergency department treatment of panic attacks. As stated above, Tompkins also testified he had never gone to the emergency department for a panic attack. (R. at 50.)

Tompkins stated he was "not really" a discipline problem in school. (R. at 465.) He had no difficulty obtaining his driver's license. (R. at 465.) Tompkins reported he only "lasted a week" when he tried to return to work due to physical issues. (R. at 465.) He stated he currently was divorced, and his girlfriend lived with him. (R. at 465.)

On mental status examination, Tompkins was "quite cooperative." (R. at 466.) He was "quite anxious," as indicated by shaking, trembling and poor eye contact, and he had halting and soft, but coherent, speech. (R. at 466.) Tompkins had some difficulty following questions, but spontaneously generated conversation throughout the evaluation. (R. at 466.) Thought process and stream of thought were within normal limits, and thought content was devoid of delusions, preoccupations, obsessions or phobias. (R. at 466.) There was no evidence of hallucinations or delusions, but Tompkins's mood appeared quite anxious with a commensurate affect. (R. at 466.) He was fully oriented; judgment was within normal limits; immediate memory was mildly deficient, evidenced by an ability to recall three of four words immediately; recent memory was markedly deficient, evidenced by an ability to recall one of four words after 30 minutes; and remote memory was normal, evidenced by an ability to name the president, provide his own date of birth and act as a good historian. (R. at 466.) Tompkins's concentration also was within normal limits, evidenced by an ability to complete Serial 3s, Serial 7s and spell the word "world" both forward and backward. (R. at 466.)

Jennings diagnosed Tompkins with panic disorder; somatic symptom disorder with persistent pain; and depressive disorder, unspecified. (R. at 466-67.) She opined his prognosis, with treatment, was guarded, but she found he was capable of managing his finances. (R. at 467.) Jennings further opined Tompkins could not

hold gainful employment due to severe anxiety and persistent, chronic pain.  (R. at 467.)  Specifically, she opined he would have difficulty interacting with others on a consistent basis, absenteeism would be an issue, and he would be unable to complete complex instructions.  (R. at 467.)

On February 17, 2016, Stephen P. Saxby, Ph.D., a state agency psychologist, completed a PRTF in connection with the reconsideration of Tompkins's disability claim.  (R. at 86-87.)  He concluded that Tompkins was mildly restricted in his activities of daily living, experienced moderate difficulty in his ability to maintain social functioning and to maintain concentration, persistence or pace, and he had experienced no extended-duration episodes of decompensation.  (R. at 87.)  Saxby noted that the totality of the evidence and Tompkins's activities of daily living were consistent with moderately limited concentration and supported a finding of a severe combination of mental impairments that would limit Tompkins to simple, routine tasks.  (R. at 87.)  Saxby gave little weight to Jennings's opinion because it did not fully correlate with the findings from other providers and appeared to be an overestimate of Tompkins's limitations.  (R. at 88.)

Saxby also completed a mental residual functional capacity assessment of Tompkins, finding he was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept

instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (R. at 90-92.) In all other areas of mental functioning, Saxby found Tompkins was not significantly limited. (R. at 90-92.) Saxby opined that Tompkins was able to understand and remember simple instructions; he would have some distractibility and slowed work pace due to mental symptoms, but would be able to maintain attention and concentration for two-hour periods over an eight-hour workday in order to carry out simple tasks; he could accept instructions from supervisors and interact appropriately with the public and co-workers in a setting with reduced interpersonal demands; and he would be slow to adapt to change, but could function with a stable work assignment. (R. at 90-92.) He also opined Tompkins could be aware of hazards, negotiate transportation to work and plan for simple tasks. (R. at 91-92.)

Tompkins received Suboxone treatment for opioid addiction at Watauga Recovery from June 2016 to November 2017. (R. at 517-28.) On June 30, 2016, it was noted that Tompkins was restarting treatment after a six-month absence. (R. at 528.) Specifically, he was discharged from treatment in December 2015 for multiple polysubstance fails. (R. at 528.) Tompkins reported working some odd jobs and doing some carpentry work. (R. at 528.) He further reported he was working on getting his CDL renewed. (R. at 528.) On examination, Tompkins was alert, oriented and cooperative with no focal neurological deficits. (R. at 528.) He was diagnosed with opioid and benzodiazepine dependence, and he was prescribed Suboxone and low-dose Klonopin. (R. at 527-28.) Tompkins was encouraged to attend 12-step meetings and get a sponsor. (R. at 528.) When he returned on July 8, 2016, he had not attended any meetings. (R. at 525.) Tompkins requested more Klonopin because he was nervous and could not sleep. (R. at 525.) He stated he

used Norco and Klonopin the previous day, and guidelines were reviewed, after which Tompkins agreed to follow the treatment plan.  (R. at 526.)  His examination and diagnoses were unchanged.  (R. at 525.)  Haloperidol was added to Tompkins's medication regimen for anxiety and sleeplessness, and he again was encouraged to attend meetings and get a sponsor.  (R. at 525.)

Tompkins did not return to Watauga Recovery until October 30, 2017, at which time he reported being "cut" due to relapsing.  (R. at 520.)  He also stated he had been incarcerated after slapping his daughter, and had just been released the previous Tuesday.  (R. at 520.)  He reported no relapse or problems with medication, but he stated he needed a higher Klonopin dosage.  (R. at 523.)  Tompkins reported dealing with some stress, and he requested a schedule of substance abuse meetings.  (R. at 523.)  He stated he had used Subutex, marijuana, Ativan and Klonopin over the previous month.  (R. at 520.)  On examination, he was alert, oriented and cooperative with good eye contact.  (R. at 521.)  He was interactive and responded appropriately to questions.  (R. at 521.)  Tompkins denied suicidal and homicidal ideations, as well as hallucinations.  (R. at 521.)  He was diagnosed with opioid use disorder, and he was deemed to be an appropriate candidate for office-based treatment.  (R. at 521.)  Tompkins was prescribed Suboxone, Vistaril and Narcan nasal spray.  (R. at 520.)  When he returned on November 6, 2017, he reported having a very rough week and was going through a lot of personal issues.  (R. at 518.)  He stated he relapsed on Klonopin,[9] and he stated he had not been sleeping or eating.  (R. at 517-18.)  On examination, Tompkins was alert, oriented and cooperative with no focal neurological deficits.  (R. at 518.)  He had normal speech, no psychosis and a normal affect.  (R. at 518.)  Tompkins was deemed to be at high risk for cravings

---

[9] At another point, Tompkins reported no issues with treatment or relapse.  (R. at 517.)

and relapse, his Suboxone was temporarily increased, and he was continued on Vistaril.  (R. at 518.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This

court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Tompkins argues that the ALJ erred by failing to give full consideration to psychologist Jennings's findings regarding the severity of his mental impairments and resulting effects on his ability to work. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Tompkins also argues that the ALJ erred by giving more weight to the opinions of the state agency psychologists. (Plaintiff's Brief at 5.) For the following reasons, however, I find that the ALJ properly weighed the medical opinion evidence in arriving at his mental residual functional capacity finding.

In January 2016, consultative psychologist Jennings diagnosed Tompkins with panic disorder; somatic symptom disorder with persistent pain; and depressive disorder, unspecified. She opined he could manage his own finances, but he would have difficulty interacting with others on a consistent basis, absenteeism would be an issue, and he could not complete complex instructions. She further opined Tompkins could not hold gainful employment due to severe anxiety and persistent, chronic pain.

In his decision, the ALJ found that Tompkins had the residual functional capacity to perform a limited range of light work that that did not require the

performance of more than simple instructions and maintaining persistence to perform simple tasks throughout a standard workday; that did not require more than few day-to-day changes; and that did not require working in an environment with heavy interpersonal demands. In making this residual functional capacity finding, the ALJ gave "little weight" to the opinion of psychologist Jennings, but he gave "great weight" to those of the state agency psychological consultants.

The ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources. *See* 20 C.F.R. § 404.1527(c)(1) (2019); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). However, the regulations set forth the factors an ALJ must consider in deciding how much weight a medical opinion should be afforded. *See* 20 C.F.R. § 404.1527 (2019). In his decision, the ALJ stated he was giving Jennings's opinion "little weight" for several reasons. (R. at 19.) First, the ALJ stated that Tompkins had undergone no inpatient psychiatric treatment, and he had received no mental health counseling – both facts that Jennings had acknowledged in her evaluation. (R. at 19.) Next, the ALJ emphasized that Jennings had seen Tompkins on only one occasion for a consultative examination. (R. at 19.) *See* 20 C.F.R. § 404.1527(c)(2) (2019) (generally, more weight will be given to a source with a detailed, longitudinal picture of a claimant's medical impairments). Third, the ALJ noted that, despite a documented history of polysubstance abuse, Tompkins was not honest with Jennings and, instead, denied any current or previous drug or alcohol abuse. (R. at 19.) Therefore, the ALJ stated, Jennings did not have the opportunity to factor Tompkins's drug abuse into her opinion. (R. at 19.) Lastly, the ALJ found that Tompkins's activities of daily living, which included, among other things, caring for his two minor children every other week, showed that he was more capable than Jennings's work-related limitations suggested. (R. at 19.) An ALJ may consider a claimant's activities of daily living

in deciding what weight to give to a medical opinion. *See* 20 C.F.R. § 404.1527(c)(6) (2019) (the ALJ considers other factors that tend to support or contradict the opinion).

As the ALJ stated, Tompkins's treatment history is devoid of any inpatient psychiatric treatment or mental health counseling. In fact, Tompkins's treatment history contains no psychological, psychiatric or mental health treatment by any mental health professionals. Instead, Tompkins's treatment for anxiety and panic has been conservative in nature and consisted only of medications prescribed by his primary care providers and the healthcare professionals who treated him for polysubstance dependence. Additionally, despite Tompkins's statement to Jennings that he had sought emergent treatment for his panic attacks, there is no corroborating evidence of such treatment contained in the record, and Tompkins testified at his hearing that he had not sought such treatment. In fact, the only documented emergent treatment sought, other than for physical issues, was for a drug overdose in July 2014. At that time, Tompkins did not complain of panic attacks or any other psychiatric issues, and none were noted.

Along those same lines, the record shows that Tompkins's mental status over the relevant time period was mostly within normal limits or indicated only mild findings. For instance, in January 2012, when he presented to the emergency department with physical complaints, psychiatric findings were normal. At a June 2012 follow-up with Dr. Corradino, he was described as cooperative. From March 2014 to February 2015, Dr. Kanwal diagnosed Tompkins with anxiety with panic. In March 2014, Dr. Kanwal checked boxes indicating insomnia, anxiety and nervousness, and he stated that Tompkins was stressed out and could not "handle people;" Tompkins, however, reported he was going through a divorce at that time.

In April 2014, Dr. Kanwal deemed Tompkins's psychiatric condition stable.  In June and July 2014, Dr. Kanwal indicated panic and chronic anxiety on examination.  In December 2014, Tompkins again reported he was going through a divorce and was very agitated.  Later that month, Dr. Kanwal deemed Tompkins's psychiatric condition stable.  Throughout this time, Dr. Kanwal treated Tompkins's anxiety and panic with medications, including Valium, Prozac and Klonopin.

In July 2015, Dr. Robinson described Tompkins as alert, fully oriented and cooperative.  He was somewhat anxious appearing, but he was able to communicate without deficits, and recent and remote memory were intact.  Tompkins was able to hold a conversation and respond appropriately to questions, but Dr. Robinson noted he appeared to have poor concentration.  Although Dr. Robinson recommended a psychiatry referral, she indicated this was for the purpose of changing Tompkins's medication to a nonbenzodiazepine, given his history of opioid addiction. Psychiatric findings contained in the notes from Watauga Recovery are normal.  For example, in June 2016 and October and November 2017, Tompkins was described as alert, oriented and cooperative.  In October 2017, he also had good eye contact, and he was interactive and responded appropriately to questions.  In November 2017, he had normal speech, no psychosis and a normal affect.  The court notes that, even the mental status evaluation performed by Jennings in January 2016 contained many normal findings.  Specifically, Tompkins was described as "quite cooperative;" he had coherent speech; he spontaneously generated conversation throughout the evaluation; thought process and stream of thought, as well as thought content, were normal; he was fully oriented; judgment was normal; and concentration was normal.

Next, as the ALJ noted, Tompkins has admitted to the performance of activities of daily living that undermine Jennings's opinion.  Under the regulations,

the ALJ may properly consider a claimant's activities of daily living.  *See* 20 C.F.R. § 404.1527(c)(6) (other factors will be considered that tend to support or contradict a medical opinion in determining how much weight it should receive); 20 C.F.R. § 404.1529(c)(3)(i) (2019) (a claimant's activities of daily living may be considered when determining disability).  Here, the ALJ specifically pointed to Tompkins's ability to care for his two minor children every other week, which included feeding them, sending them to school and helping with homework.  In addition to these activities, the record further shows that Tompkins was able to go for walks, feed his parents' dogs on occasion, watch television and help out around the house. Furthermore, the record shows, and Tompkins does not dispute, that he returned to his work as a truck driver for approximately six months after his alleged onset date. Specifically, although his alleged onset date is December 13, 2011, the date of his motor vehicle accident, Tompkins returned to work around June 2012, working on a "part-time" basis until approximately January 2013.  Moreover, Tompkins testified that he had to stop working due to his physical ailments, not due to his mental health. The record also reveals that Tompkins reported in June 2016 that he was working some odd jobs and doing some carpentry work.

The court further notes that, while Jennings opined Tompkins could not perform substantial gainful activity, this is not a medical opinion, but a finding that is reserved solely to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(1) (2019).  As such, it is entitled to no special significance.  *See* 20 C.F.R. § 404.1527(d)(3) (2019).

For all these reasons, I find that substantial evidence supports the ALJ's decision to give little weight to the opinion of psychologist Jennings.  Instead, as stated above, the ALJ gave great weight to the opinions of the state psychological consultants, Perrott and Saxby.  In particular, he stated that their opinions were

similar and were based on the same treatment records. (R. at 19.) They are similar in the sense that neither opined Tompkins's mental impairments were disabling. However, Perrott found Tompkins did not suffer from a severe mental impairment, while Saxby did. Also, Saxby had the opportunity to review the evaluation performed by Jennings, while Perrott did not. Finally, the court notes that Saxby performed a mental residual functional capacity assessment of Tompkins, while Perrott did not, and which appears to be the basis for the ALJ's mental residual functional capacity finding. Therefore, the court will analyze whether substantial evidence supports the ALJ's decision to give great weight to Saxby's opinion. For the following reasons, I find that it does.

In February 2016, Saxby opined Tompkins was mildly restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no extended-duration episodes of decompensation. Saxby also completed a mental assessment, in which he opined Tompkins could understand and remember simple instructions; he could maintain attention and concentration for two-hour periods over an eight-hour workday in order to carry out simple tasks; he could accept instructions from supervisors and interact appropriately with the public and co-workers in a setting with reduced interpersonal demands; and he could function with a stable work assignment. Saxby further opined that Jennings overestimated the severity of Tompkins's restrictions, and her opinion was based only on a snapshot of his functioning. He further noted that even Jennings's mental status examination of Tompkins was intact, except for an anxious mood with soft and halting speech and poor immediate and recent memory. Additionally, Saxby noted that Tompkins's anxiety was treated conservatively with medication.

As noted by the ALJ, Saxby, as a state agency psychological consultant, is highly qualified and an expert in Social Security disability evaluation. (R. at 19.) *See* 20 C.F.R. § 404.1513a(b)(1) (2019). As such, his opinion merits significant consideration. *See* 20 C.F.R. § 404.1513a(b)(1); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Additionally, the ALJ correctly noted that Saxby's opinion was consistent with the treatment notes of record. (R. at 19.) *See* 20 C.F.R. § 404.1527(c)(4) (2019) (the more consistent an opinion is with the record as a whole, the more weight it will receive). The court notes that Saxby's opinion that Tompkins could perform simple, routine tasks due to moderately limited concentration is consistent with Dr. Robinson's observation that Tompkins appeared to have poor concentration, but could hold a conversation and respond appropriately to questions. It also is consistent with Jennings's mental status findings that he had some difficulty following questions, but spontaneously generated conversation, he had normal thought process, stream of thought and thought content, judgment was normal, he had normal remote memory, mildly deficient immediate memory and markedly deficient recent memory, and concentration was normal. Jennings opined that Tompkins could not complete complex instructions. As stated earlier, the evidence set out above, including a conservative mental health treatment history, relatively benign psychiatric findings and Tompkins's activities of daily living and ability to return to work for an approximate six-month period during the relevant time, indicates that Saxby's opinion is consistent with the record as a whole.

For all these reasons, I find that the ALJ's decision to give great weight to Saxby's opinion is supported by substantial evidence. For the same reasons, I further find that the ALJ's mental residual functional capacity assessment of Tompkins is supported by substantial evidence, as well.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's mental residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Tompkins was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Tompkins's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of

the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     May 18, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE